THE CENTRAL MUTUAL LIFE INSURANCE ASSOCIATION

*v.*

CHARLOTTA C. ANDERSON.

*Opinion filed February 21, 1902.*

1. APPEALS AND ERRORS—*when instruction to find for the defendant is properly refused.* An instruction to find a verdict for the defendant is properly refused if there is competent evidence in the record fairly tending to prove plaintiff's case as made in his declaration.

2. SAME—*when shooting is not "suicide," within meaning of insurance policy.* If at the time the insured shot himself he was insane and his reasoning faculties were so impaired that he was unable to understand the moral character, general nature, consequence and effect of the act, or if he was impelled thereto by an insane impulse which he did not have power to resist, then his act is not suicide, within the meaning of the terms of a policy providing that "this policy is void in case of death by suicide."

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

JAMES McCARTNEY, for appellant.

EDWIN A. OLSON, for appellee.

Mr. JUSTICE RICKS delivered the opinion of the court:

This is an appeal from the Appellate Court for the First District affirming a judgment of the circuit court of Cook county in favor of appellee. Appellee was the beneficiary on two insurance policies, each for the sum of $1000, issued February 27, 1896, on the life of John Anderson, husband of appellee. The insured died November 30, 1896, as the result of a pistol ball fired into his brain by his own hand on November 23, 1896. The application, which by the conditions of the policy was made a part thereof, contained the agreement, "This policy is void in case of death by suicide." Appellee sued on both policies, and appellant pleaded the above condition in the policy, and that the insured died by his own hand, and by reason thereof the policy became void. Appellee replied, that at the time the shot was fired said John Anderson was of unsound mind, wholly and entirely unconscious of the physical and moral consequences of the act, and was the subject of an insane impulse which he had no power to resist, and committed the act of suicide unintentionally. Issue was joined and a trial had by a jury, resulting in a verdict for the appellee in the sum of $2317.80. The appellee remitted the excess over $2290, and judgment was entered for the latter sum.

At the close of the plaintiff's evidence, and again at the close of all the evidence, the appellant offered and requested the court to give an instruction directing the jury to find a verdict for defendant, which the court refused to do. Appellee offered no instructions, and all

the instructions asked by appellant, save the instruction directing a verdict, were given.  No complaint is made as to the admission or exclusion of evidence, and the only matter for us to consider is the refusal of the court to give the peremptory instruction.  If there was competent evidence in the record fairly tending to prove the plaintiff's case as made in his declaration, then the instruction was properly refused.  *Illinois Central Railroad Co.* v. *Harris*, 184 Ill. 57; *Chicago Edison Co.* v. *Moren*, 185 id. 571; *Landgraf* v. *Kuh*, 188 id. 484.

The evidence showed that in July, 1896, John Anderson, the insured, received injuries to his head, arm and hand.  The injuries to his hand were of such a nature that three fingers were amputated.  He was a carpenter, of steady, industrious habits, and his family relations were pleasant.  As a result of these injuries he was confined to the hospital for some time, and from the time of the injuries to the time of his death he was never able to do any work.  He was fifty-five years of age.  The evidence shows that after the injury he could not stand to be out in the sun, and that the fact that he was unable to work caused him much worriment.

Edward Hutchinson, who lived within seventy-five feet of him, testified that he had known John Anderson six or seven years prior to his death and saw him once or twice a day during the last years of his life, the last time being two or three days before he shot himself; that he visited his family and that the family relation was pleasant; that he noticed a change in his mental condition after he was injured, in July; that when asked how he was he would usually reply, "I am all right, but my head pains me so I will go crazy;" that about two weeks before he shot himself the witness took him a drive in a buggy, and when they were driving across the railroad tracks Anderson grabbed the lines and shouted that an engine was coming and would strike them; that there was no engine in sight; that Anderson was greatly excited.

Dr. Craig testified that he was the physician who treated Anderson at the time he received his injuries, in July; that there were general bruises on his arms, face and head and that two or three fingers of his hand were amputated; that he had known Anderson for six or seven years before the injury; that he saw him a dozen times after he left the hospital and that Anderson appeared to be mentally unbalanced; that he considered him of unsound mind; that when inquired of as to how he received the injuries in July he would give no information about it, and that when he came to the office of witness a number of times he acted strangely; that the day before he shot himself Anderson came into the witness' office and said that there were a number of people in the reception room, and inquired if they would harm him; that witness asked what he meant and why he thought so; that he replied that every one was laughing at him and was making fun of him; that witness directed him to sit down and he would see him, when Anderson replied that he knew he had snakes in his stomach and that he was going to leave, and asked the witness to make an appointment for the next morning, before anybody else saw him. This conversation took place the day before or the day of the shooting.

Anne Coleman, a neighbor, testified that she had known Anderson for eight years and was a near neighbor, and that appellee would often request her to come and stay at the house while she would go to do her marketing; that when the door bell would ring Anderson would become frightened and run in the bed-room and close the door; that she would go to the door and then come back and find Anderson and tell him to come out, and that he would come out like a child and seem scared. One time she said he was troubled about his inability to work, and said, "It's terrible, and I can't work any more." She said, "What will you do?" and he said, "I will buy an organ, and you can come along and dance, and I will

sing, and I can make my living." She said that this conversation was carried on seriously by Anderson, and that she thought he was insane.

Oscar Greyer testified that he had known Anderson about fifteen years; that he lived within a block and a half of him and saw him every day during the last three years; that he saw him twice in the hospital; that his conduct and demeanor were different after he received the injury; that he acted foolish and silly; that he talked to him every day or two before he was shot and after the injury; that Anderson came into witness' place carrying a big iron chain, and witness asked him what he was going to do with it, and that Anderson replied that he was going to lock all the democrats in the neighborhood in the barn; that there were too many democrats and that he was going to lock them in, and that people were after him to kill him and hurt him; that witness believed that Anderson was insane.

Margaret Powell testified that she was a near neighbor and visited the Anderson home frequently, and saw Anderson three or four times a week during the last year of his life; that after he received the injury, when she would go to his house she would have to tell him who she was; that he did not appear to know her, and acted frightened and tried to avoid her; that he told her that he could not think about work any more, and if he did his head got in a whirl and he could not think of anything, and that he said several times that he had pains in his head.

Peter Swanson testified that he had known Anderson for seventeen years; that he met him on the day of the shooting; that he asked witness to take a drink with him, and that in a conversation he told the witness that the rats were bad about his house, and that he thought it best to throw matches around there, and he said, "I will see if I can shoot them;" that they took two or three drinks together, but that Anderson was not drunk, and

that the manner of his talk and the subject of his conversation were unusual, and, as witness puts it, seemed very funny to him; that he thought it strange, as he had never heard Anderson talk that way all the time he was with him; that while he was with Anderson in the saloon Anderson went into the water-closet, and those in the saloon heard the report of a revolver and found he had shot himself.

John Palmer testified that he had known Anderson for a number of years, and saw him every other day, and sometimes twice a day, after he was injured, in July; that on the day of the shooting he came into the witness' place and said: "John, I want you to do me a favor; I know you can." Witness said, "All right." Anderson said: "I got a big billy at home and I want you to fix it." Witness asked what he was going to use the billy for, and Anderson replied: "I am going to kill the rats in the basement." He said that at that time he, Anderson, was very nervous, and that he acted so foolish that he thought he was insane.

Appellee testified that after the injury, and for two weeks prior to his death, Anderson could not sleep; that he would sit up in the bed and cry, "My head is gone;" that she would say, "Don't believe that;" that he would then say that some one was going to kill him, and that he would appear lost and not know where he was; that he asked her if he was at home; that she would tell him yes, and that nobody would hurt him; that then he would ask where their boy was, and she would tell him that the boy was in bed, asleep, and he would say, "I am afraid of every one;" that at other times when she would find him sitting up in the bed and ask what was the matter, he would say: "I can't sleep; my head kills it; it sounds to me like the bell on New Year's night;" that a day or so before the shooting he said: "To-morrow I will go to a doctor down town; there are so many strangers in Dr. Craig's office it will do me more harm than good;" that

at times he would forget that he had had his meals and would ask her if she was going to give him anything to eat, and that when she would tell him that he had eaten he would say that he had forgotten it; that he also said: "I was going to kill that person, but I won't hurt you; somebody wants to kill me."

George Johnson testified that two or three days before the shooting Anderson came into where he was tending bar and called for a glass of beer; that he set the beer on the counter, and Anderson asked if he was not going to get the beer that he had called for; that the witness replied, "Yes, it is there on the counter," but that Anderson turned and went out rubbing his head and did not drink it.

Carl Gifford testified that on the day of the shooting he sold Anderson cartridges, and that Anderson said he was going to shoot a big dog that was hanging around his yard, and that he did not notice anything unusual about him. Two or three other witnesses testified that they knew Anderson and had met him occasionally but had noticed nothing unusual in his conduct.

This was all the testimony offered, and from it we think the conclusion is warranted that Anderson was insane, and if he was insane, the only remaining question was as to the degree of his insanity, and what, if anything, it had to do as the inducing or moving cause of the shooting. These were matters of fact upon which the finding of the jury would have great weight. If at the time of the shooting he was insane and his reasoning faculties were so impaired that he was not able to understand the moral character, the general nature, consequence and effect of the act he was about to commit, or if he was impelled thereto by an insane impulse which he did not have power to resist, then his act was not suicide, within the sense of the term as used in the application and policy of insurance. *Grand Lodge Independent Order Mutual Aid* v. *Wieting*, 168 Ill. 408.

We think, upon the whole evidence, upon either of these theories, there was competent evidence fairly tending to prove appellee's case, and that therefore the refusal of the instructions asked was not error.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*